IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| TAMARRA SOWELL, as personal representative, | ) | |
| administrator for the Estate, and on behalf of the heirs | ) | |
| of ADEKUNLE ODUMABO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROY DOMINGUEZ, individually and in his | ) | |
| official capacity as sheriff of Lake County, Indiana; | ) | 2:09-cv-0047 |
| BENNIE FREEMAN, individually and in his official | ) | |
| capacity as warden of Lake County Jail; | ) | |
| SOUTHLAKE CENTER FOR MENTAL HEALTH | ) | |
| Southlake Center employees DR. LEE PERIOLAT and | ) | |
| MANUEL BARRAGAN; Lake County Jail employees | ) | |
| OFFICER JANICE HATTON, OFFICER LINDA RILEY, | ) | |
| SERGEANT R. STARKEY, and SERGEANT HUBNER; | ) | |
| and UNKNOWN EMPLOYEES AND SUPERVISORS | ) | |
| OF LAKE COUNTY JAIL; AND SOUTHLAKE CENTER | ) | |
| FOR MENTAL HEALTH, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

This matter is before the court on the Motion to Compel Discovery [DE 116] filed by the

plaintiff, Tamarra Sowell, on May 31, 2013, and the Motion to Determine Sufficiency of

Plaintiff's Responses to Defendant Dominguez's First Request for Admissions [DE 118] filed by

Roy Dominguez, on June 1, 2013.  For the following reasons, the Motion to Compel Discovery

[DE 116] is **GRANTED,** and the Motion to Determine Sufficiency of Plaintiff's responses to

Defendant Dominguez's First Request for Admissions [DE 118] is **GRANTED IN PART** and

**DENIED IN PART.**

*Background*

The plaintiff, Tamarra Sowell, brought this action against the Sheriff of Lake County, the

Warden of the Lake County Jail, Southlake Center for Mental Health, and various employees

and

supervisors of Lake County Jail and Southlake after Adekunle Odumabo hanged himself on

April 30, 2007, while an inmate at the Lake County Jail. Sowell brought suit under 42 U.S.C.

§1983 for violations of Odumabo's constitutional rights; the Indiana Wrongful Death Statute,

Ind. Code §34-23-1-1; and Indiana's Personal Civil Liability Under Civil Rights Laws of

Employee Acting Within Scope of Employment, Ind. Code §34-13-4-1. Sowell alleges that

Odumabo died because the Lake County Jail staff knew Odumabo should be monitored as a

suicide risk but failed to have him under suicide watch.

Over the course of discovery Sowell served several document requests and

interrogatories on the Sheriff and Southlake.  Specifically, Sowell asked Southlake to turnover:

> 1. All records regarding detainees who were released from Lake County Jail due
> to death, including all records surrounding those detainees' incarcerations at the
> Jail.
>
> 2. All records regarding detainees who were discovered non-responsive at Lake
> County Jail and were pronounced dead at the hospital to which they were
> transferred from the Jail. This request includes all records surrounding those
> detainees' incarcerations at the Jail.
>
> 3. All records related to suicide and suicide attempts at the Lake County Jail.

Sowell later limited her request to the records prepared between 2002 and when

Southlake ended its services at the Lake County Jail.  Southlake objected to these requests on

various grounds, including that producing the information would violate Health Insurance

Portability & Accountability Act of 1996 (HIPAA).  After reviewing this objection, Sowell

proposed a protective order.

Sowell also requested that the Sheriff produce:

16. All Documents relating to all suicides and attempted suicides that took place in Lake County Jail since January 1, 2000, including but not limited to: a) complaints; b) internal reviews and investigations of these events; and c) external reviews and investigations of these events.

17. All Documents relating to deaths that took place in Lake County Jail since January 1, 2000, including but not limited to: a) complaints; b) internal reviews and investigations of these events; and c) external reviews and investigations of these events.

The Sheriff argues that the requests were overbroad and vague and that producing the information would violate HIPAA and Indiana Code §§ 16-39-1-1 *et seq*. and Ind. Code §§ 16-39-2-1 *et seq*., which prohibits the release of mental health records.

Sowell also asked the Sheriff to identify and describe all changes made to the jail's policies, practices, and training related to the evaluation and monitoring of detainees for suicide potential. Sowell specifically inquired into how the employees were made aware of the changes and complains that the Sheriff did not respond. Likewise, Sowell stated that the Sheriff did not provide a complete response to her interrogatory concerning every instance in the last ten years that a policymaker reviewed or investigated a potential, attempted, or actual suicide by a jail detainee. The Sheriff responded that the request was ambiguous and that he could not discern what was meant by potential or attempted suicide.

Southlake's representative, Sherry Oman, stated at her deposition that she had learned through other employees that a mortality review was conducted following Odumabo's suicide but that she was not part of the review and had not seen any documents related to the review. Sowell asked Southlake to produce any documents prepared in connection with the mortality

review it conducted and to admit or deny the following statements:

1. Southlake Center performed no mortality review of the death of Adekunle Odumabo.

2. Southlake Center performed no psychological autopsy of the death of Adekunle Odumabo.

3. No employee of Southlake Center performed a mortality review of the death of Adekunle Odumabo.

4. No employee of Southlake Center performed a psychological autopsy of the death of Adekunle Odumabo.

5. Southlake Center did not direct any person to perform a mortality review of the death of Adekunle Odumabo.

6. Southlake Center did not direct any person to perform a psychological autopsy of the death of Adekunle Odumabo.

7. Southlake Center possesses no documents of a mortality review of the death of Adekunle Odumabo.

8. Southlake Center possesses no documents of a psychological autopsy of the death of Adekunle Odumabo.

Southlake stated that it did not understand what the terms "mortality review" and "psychological autopsy" encompassed and that it did not have knowledge of whether any such review was conducted because its representative had not viewed or been a part of any such review.

Sowell asked Southlake for a variety of other documents, including monthly reports, a notebook kept by Patria Kerr, time sheets on which the Southlake defendants recorded the inmates they saw, the research and writing of Dr. Lee Periolat, the tabulated sheets that recorded the number of visits by each Southlake doctor per patient, and invoices Dr. Periolat gave to Southlake for his work. Southlake agreed to turnover some of these documents, but the parties continue to dispute whether Southlake must produce the reports that documented monthly and

yearly statistics regarding suicides and attempted suicides, the time sheets on which the Southlake defendants recorded which inmates they saw, and the tabulated sheets that recorded the number of visits by each Southlake doctor per patient. Southlake stated that it no longer possessed some of the documents Sowell requested because they were left behind when Southlake's relationship with the jail was terminated.

Finally, Sowell moves to compel the Sheriff to produce Odumabo's original file. The Sheriff has agreed to make the file available to Sowell at the jail for inspection.

The Sheriff, Roy Dominguez, served a request for admissions on Sowell, asking that she admit or deny the following statements:

> Admission No. 3. On April 26, 2007, Adekunle Odumabo was arrested and placed in the custody of the United States Marshal's Service.
>
> Admission No. 8. Adekunle Odumabo was born in Nigeria.
>
> Admission No. 9. Adekunle Odumabo was a citizen of Nigeria.
>
> Admission No. 10. Adekunle Odumabo was not born in the United States.
>
> Admission No. 11. Adekunle Odumabo was not a naturalized citizen of the United States.

Sowell objected to Admission Nos. 8-11 as irrelevant. The Sheriff responded that this information may shed light on Odumabo and Sowell's credibility because at a hearing before Magistrate Judge Paul Cherry, Odumabo stated that he was born in Nigeria and was not a citizen of the United States. In response to Admission No. 3, Sowell stated:

> Admit that Mr. Odumabo was arrested. To the extent that this Request is seeking to know whether the United States Marshal's Service was responsible for the care and custody of Mr. Odumabo during his incarceration at Lake County Jail, denied. To the extent this request is seeking to know whether Mr. Odumabo was held by the United States Marshal's Service at some point on or after April 26, 2007 - during times that he was not detained at Lake County Jail - admit.

The Sheriff complains that this response is insufficient and non-responsive. The Sheriff moves to compel complete responses or for the court to deem these statements admitted.

*Discussion*

A party may "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things." **Federal Rule of Civil Procedure 26(b)(1)**. For discovery purposes, relevancy is construed broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." ***Chavez v. DaimlerChrysler Corp.**,* 206 F.R.D. 615, 619 (S.D. Ind. 2002)(quoting ***Oppenheimer Fund, Inc. v. Sanders***, 437 U.S. 340, 351, 98 S. Ct. 2380, 2389, 57 L.Ed.2d 253 (1978)). Even when information is not directly related to the claims or defenses identified in the pleadings, the information still may be relevant to the broader subject matter at hand and meet the rule's good cause standard. ***Borom v. Town of Merrillville***, 2009 WL 1617085, *1 (N.D. Ind. June 8, 2009) (citing ***Sanyo Laser Prods., Inc. v. Arista Records, Inc.***, 214 F.R.D. 496, 502 (S.D. Ind. 2003)); *see also **Adams v. Target***, 2001 WL 987853, *1 (S.D. Ind. July 30, 2001)("For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."); ***Shapo v. Engle***, 2001 WL 629303, *2 (N.D. Ill. May 25, 2001)("Discovery is a search for the truth.").

A party may seek an order to compel discovery when an opposing party fails to respond to discovery requests or has provided evasive or incomplete responses. **Federal Rule of Civil Procedure 37(a)(2)-(3)**. The burden "rests upon the objecting party to show why a particular discovery request is improper." ***Gregg v. Local 305 Ibew***, 2009 WL 1325103, *8 (N.D. Ind.

May 13, 2009)(citing ***Kodish v. Oakbrook Terrace Fire Protection Dist.***, 235 F.R.D. 447, 449-50 (N.D. Ill. 2006)); ***McGrath v. Everest Nat. Ins. Co.***, 2009 WL 1325405, *3 (N.D. Ind. May 13, 2009)(internal citations omitted); ***Carlson Restaurants Worldwide, Inc. v. Hammond Professional Cleaning Services***, 2009 WL 692224, *5 (N.D. Ind. March 12, 2009)(internal citations omitted). The objecting party must show with specificity that the request is improper. ***Cunningham v. Smithkline Beecham***, 255 F.R.D. 474, 478 (N.D. Ind. 2009)(citing ***Graham v. Casey's General Stores***, 206 F.R.D. 253, 254 (S.D. Ind. 2002)). That burden cannot be met by "a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." ***Cunningham***, 255 F.R.D. at 478 (citing ***Burkybile v. Mitsubishi Motors Corp.***, 2006 WL 2325506, *6 (N.D. Ill. Aug. 2, 2006))(internal quotations and citations omitted). Rather, the court, under its broad discretion, considers "the totality of the circumstances, weighing the value of material sought against the burden of providing it, and taking into account society's interest in furthering the truth-seeking function in the particular case before the court." ***Berning v. UAW Local 2209***, 242 F.R.D. 510, 512 (N.D. Ind. 2007)(examining ***Patterson v. Avery Dennison Corp.,*** 281 F.3d 676, 681 (7th Cir. 2002))(internal quotations and citations omitted). *See also,* ***Hunt v. DaVita, Inc***., 680 F.3d 775, 780 (7th Cir. 2012)(explaining that the district court has broad discretion in supervising discovery).

      Sowell asked Southlake to provide all records from detainees who were released from Lake County Jail due to death, all records of detainees who were discovered non-responsive at the Lake County Jail and pronounced dead at the hospital, and all records related to suicide and

suicide attempts in the Lake County Jail.  Similarly, Sowell sought all documents related to all suicides and attempted suicides and all documents related to all deaths that took place in the Lake County Jail since January 2000 from the Sheriff.  Neither defendant produced the requested documents.  The defendants raised several objections to Sowell's requests.

First, the defendants argue that the information is irrelevant because Sowell did not allege substandard treatment of others and would not have standing to do so.  However, the defendants overlook the elements Sowell must prove to succeed at her claim.  Sowell's complaint alleges violations of Odumabo's constitutional rights under 42 U.S.C. § 1983.  Section 1983 imposes municipal liability for deprivations pursuant to an official policy or practice but bars liability under a respondeat superior theory. *City of Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989)*.* The Supreme Court has determined that a plaintiff must plead a policy, custom, or practice of the municipality which has caused the alleged constitutional deprivation before the municipality may be held liable for the employee's conduct. *Canton*, 489 U.S. at 389, 109 S.Ct. at 1203; *Monell v. Department of Social Services*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978); and *Gibson v. City of Chicago*, 910 F.2d 1510, 1519 (7th Cir. 1990). In addition, although a municipality may be held liable for failing to train its officers adequately, no municipal liability can be imposed unless the lack of training amounts to "deliberate indifference" to the individual's constitutional rights. *Canton*, 489 U.S. at 390, 109 S.Ct. at 1205–06. In *Canton*, the Supreme Court stated:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably have been said to have been deliberately indifferent to the need.

(footnotes omitted)

489 U.S. at 390, 109 S.Ct. at 1205

In a municipal liability claim, the policy or custom must be the cause of the constitutional deprivation.

To succeed, Sowell will need to prove that the defendants had a policy or practice that led to the deprivation of Odumabo's constitutional rights or that they failed to train their employees. In order to prove this, Sowell will need evidence of the defendants' past practices. Therefore, the information sought is clearly relevant to this task.

The Sheriff further challenges the language in requests 16 and 17 as overbroad, arguing that it is not clear what was meant by "all documents related to", "attempted suicide", and "complaint". The Sheriff argues that a request for "all documents related to" generally is too broad and ambiguous to identify to specific documents sought. However, the court does not find that to be the case here. In both requests, Sowell narrowed the scope of documents, identifying the type of documents sought, such as complaints, internal reviews and investigations, and external reviews. Although the sheriff complains that this does not shed any further light on what is sought because it is not clear what was meant by "complaint" or "attempted suicide", the Sheriff should apply the common definitions to provide the documents sought.

The Sheriff also complains about the temporal scope of the discovery, but Sowell has since limited it. Sowell further informs the court that to her knowledge there were only ten suicides within the time period for which she seeks information, and therefore, the burden would not be as onerous as the defendants state.

The defendants' primary argument is that the request violates HIPAA. Under HIPAA

and its regulations, an entity to which HIPAA applies (a "covered entity") may not disclose protected health information ("PHI") of an individual except as permitted or required by HIPAA's implementing regulations, which are set forth at 45 C.F.R. §160.101 *et seq*. HIPAA requires a party seeking PHI by discovery to: (1) provide the health care provider or other covered entity from which it seeks the PHI with satisfactory assurance, in the manner specified in the regulations, that it has made reasonable efforts to ensure that the individuals whose PHI is sought are given notice of the request; or (2) provide the health care provider or other covered entity with satisfactory assurance that it has made reasonable efforts to secure a qualified protective order that meets the requirements of the regulations. *See* **45 C.F.R. §160.512(e)(1).**

The defendants argue that Sowell did not take either step required under 45 C.F.R. § 150.101 *et seq*. for release of non-party records until March 13, 2013, when her counsel mailed a request for a HIPAA protective order. This was sent after the defendants raised their objection in response to Sowell's request for production. After acknowledging that Sowell's counsel did send a proposed protective order, the Sheriff's counsel was quick to change the topic and argued that Indiana law restricts the release of medical and mental health records.

Federal Rule of Evidence 501 provides that "the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." When the basis of federal jurisdiction is diversity, the court applies the state law of privilege. **Federal Rule of Evidence 501;** ***Country Life Ins. Co. v. St. Paul Surplus Lines Ins. Co.***, 2005 WL 3690565, *4 (C.D.Ill. Jan.31, 2005) (where the basis of federal jurisdiction is diversity, the court is to apply the state law of attorney client privilege); ***Lorenz v.***

*Valley Forge Ins. Co.*, 815 F.2d 1095, 1097 (7th Cir.1987) (applying the state law of privilege to a diversity claim in federal court). In cases where the principal claim in federal court arises under a federal law, with the information also relevant to pendent state claims, the federal common law of privileges apply. *Memorial Hospital v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981). *See also Kodish v. Oakbrook Terrace Fire Protection Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006). The court determines the principal claim by asking whether state or federal law supplies the rule of decision. *Memorial Hospital*, 664 F.2d at 1061. Otherwise, it would be meaningless to hold the same information privileged for the state claims and not for the federal claims. *Memorial Hospital*, 664 F.2d at 1061 n. 3.

Sowell's principal claim is brought pursuant to § 1983 with allegations of constitutional violations. Because federal law supplies the rule of decision for this claim, federal common law rules of privilege govern this claim. In a similar matter, the plaintiff sought the medical records of third-parties to help prove their federal claim. Judge Roger Cosbey summarily rejected the defendants' motion for a protective order, stating that "the Indiana Access to Medical Records Act is 'void and of no effect' to the extent that it can be construed to exclude evidence relevant to a claim based on federal law brought in federal court.***"** *U.S. ex rel. Roberts v. QHG of Indiana, Inc*., 1998 WL 1756728, *8 (N.D. Ind. Oct. 8, 1998). Therefore, the Indiana Access to Medical Records Act does not govern whether the defendants must turnover the third-party medical records, and the court instead must consider whether Sowell complied with the federal requirements.

It is immaterial that Sowell's proposed protective order came after the defendants raised their objections. Rule 37 states that parties should try to resolve their discovery disputes

independently, and Sowell took appropriate steps by reacting to the defendants' objections and preparing the proposed protective order. The defendants have not criticized or objected to the terms of the protective order proposed by Sowell. Although Sowell had yet to notify the individuals whose PHI she seeks, it is logical that Sowell would not notify the individuals until the parties agreed on the terms of the protective order and resolved the defendants' additional objections. Provided Sowell files the unopposed protective order and notifies the third-parties of the information sought in compliance with HIPAA, she is entitled to the information.

The defendants also raise the psychotherapist privilege. The psychotherapist privilege applies to confidential statements made between a patient and his psychotherapist, which encompasses licensed psychiatrists, psychotherapists, social workers, or other like counselor. *Await v. Marketti*, 287 F.R.D. 409, 423 (N.D. Ill. 2012) (citing *United States v. Schwensow*, 151 F.3d 650, 654 (7th Cir. 1998)). The rationale underlying the psychotherapist-patient privilege is that a patient must have complete confidence in a psychotherapist to ensure effective therapy. *Await,* 287 F.R.D. at 414(citing *Jaffe v. Redmond*, 518 U.S. 1, 10, 116 S.Ct. 1923, 1928-1929, 135 L.Ed.2d 337 (1996)). The psychotherapist-patient relationship has been compared to that of the lawyer-client. *Jaffe,* 518 U.S. at 10, 116 S.Ct. at 1928. Because a threat to secrecy would block successful treatment, the need for such a privilege is evident.

The privilege may be raised by the patient, his guardian, or his estate. *See Await*, 287 F.R.D. at 415 (explaining that the estate can raise the psychotherapist privilege on behalf of patient). A psychotherapist also may raise the defense on his patient's behalf. *In re Hospital Subpoena,* 854 F.Supp. 1380, 1391 (S.D. Ind. 1994)*.* "His authority so to do is presumed in the absence of evidence to the contrary." *Hospital Subpoena*, 854 F.Supp. at 1391 (citing Proposed

Rule of Federal Evidence 504).   However, an entity, even one that maintains the patient's records, such as a hospital, does not have standing to raise the privilege on the patient's behalf. *Hospital Subpoena*, 854 F.Supp. at 1392.

The party raising the privilege must show that it is applicable.   The privilege only extends to statements made for the purpose of receiving psychiatric treatment.   *Await*, 287 F.R.D. at 423. It does not extend to information about visits or medications, nor does it apply to statements made to third-parties, such as insurance carriers.   *Goh v. CRE Aquisition*, 2004 WL 765238, *1–2 (N.D.Ill. April 6, 2004).   The privilege also can be waived.   *See, e.g., Jaffee,* 518 U.S. at 18 n. 9, 116 S.Ct. at 1932 n. 9 (considering waiver to have occurred if disclosure is made "by the therapist" ) (emphasis added); *Beard v. City of Chicago*, 2005 WL 66074, at *7 (N.D.Ill. Jan.10, 2005); *Boudreau v. Ryan*, 2001 WL 1001156, at *3–4 (N.D.Ill. Aug. 24, 2001).   This occurs when the statements are shared with any party beyond the therapist, his employer, and his client. *See Jaffee*, 518 U.S. at 18, 116 S.Ct. at 1932.

It is not clear that any of the defendants have standing to raise the psychotherapist privilege on behalf of the patients' whose records Sowell requested.   Clearly, the Lake County Sheriff was not a psychotherapist and could not assert the privilege.   Similarly, Southlake may have maintained the records, but a record-maintaining entity does not have standing to raise the privilege either.   This leaves Dr. Lee Periolat and Manuel Barragan.   However, it is not clear what role these individuals played in the treatment of the patients whose records are sought.   The defendants have not argued that these individuals treated the patients whose records are sought, nor is it evident that the records sought contain confidential statements made for the purpose of treating the patients.   Because information, such as medications prescribed, is excluded from the

privilege, even if the defendants have standing to assert the privilege, they cannot make a blanket claim of privilege without explaining what the records encompass.

Moreover, ordering production of the records does not leave the patients without a means of protecting their records from disclosure. Rather, as explained above, HIPAA requires the patient whose information will be disclosed to be provided with an "[a]dequate notice in a manner which will not disclose patient identifying information to other persons" and an "opportunity to file a written response to the application, or to appear in person, for the limited purpose of providing evidence on the statutory and regulatory criteria for the issuance of the court order." **42 C.F.R. § 2.64(b)**. *See also Cook County*, 277 F.3d at 982.

Once notice has been given, the court next must determine whether good cause is shown by finding that "(1) other ways of obtaining the information are not available or would not be effective; and (2) the public interest and need for disclosure outweigh the potential injury to the patient, the physician-patient relationship and the treatment services." *Cook County*, 277 F.3d at 982–83 (quoting **42 C.F.R. § 2.64(d)**). If this test is met, the court may order disclosure of non-confidential information, with or without patient consent. *See Hospital Subpoena*, 854 F.Supp. at 1384. However, to disclose confidential communications in the absence of patient consent, the court must further consider if, among other circumstances, "the disclosure is necessary in connection with investigation or prosecution of an extremely serious crime, such as one which directly threatens loss of life or serious bodily injury, including . . . rape." *See* **42 C.F.R. § 2.63(a)**. If this condition is satisfied, then confidential communications also may be disclosed. *See Hospital Subpoena*, 854 F.Supp. at 1384.

For these reasons, the court **GRANTS** Sowell's motion to compel responses to

Document Requests 1-3 served on the Southlake defendants and Requests 16-17 served on the Sheriff. However, this is not to say that the defendants must turn the information over immediately. First, Sowell must submit a protective order and provide notice to the patients as required by HIPAA. Once the conditions of HIPAA are fulfilled, the defendants must turnover the information.

Sowell further asks about the steps the Sheriff's Department took to identify and fix problems with preventing inmate suicide. With respect to Interrogatory No. 4, Sowell stated that the Sheriff responded to whether changes were made to the jail's policies, but he did not explain how the jail staff was informed of the changes. In Interrogatory No. 5, Sowell asked the Sheriff to describe every instance in the last ten years in which a policy-maker reviewed or investigated any problem related to potential, attempted, or actual suicides by Lake County Jail detainees, and what steps were taken in response. Sowell explained that she needs this information to prove that policymakers knew that there was a problem with regard to suicide prevention at the jail and that they failed to fix it.

The Sheriff responded that he did in fact provide a response, explaining that Southlake, the Warden, and their supervisory staffs were responsible for reviewing, modifying, updating, and improving policies, practices, and training programs related to the evaluation and monitoring of detainees for suicide potential. The Sheriff clarified that from 2000-2002, staff was made aware of policy changes through orders handed down by the Sheriff and other jail command staff persons. After Sheriff John Bunich left office, the staff was informed of polices and changes as the Sheriff set forth in his discovery response.

The court agrees that the Sheriff's response is not specific and that his attempt to clarify

his response in his brief in response to Sowell's Motion to Compel is not sufficient. Although his response, as clarified in his response brief, may shed light on who the policy changes came from, it does not explain how the changes were communicated to the staff or what training took place. The Sheriff must provide a more specific response.

The Sheriff also argues that he provided a sufficient response to Interrogatory No. 5, which inquired about the steps policymakers took to review and prevent problems related to suicide. The Sheriff explained that problems were assessed by the Wardens and Deputy Wardens, who had meetings with their shift supervisors and staff every day to address the problems. The problems traveled up the chain of command to the Sheriff. This answer appears to be more responsive to Interrogatory No. 4, which sought information on the communications within the jail, than to Interrogatory No. 5. The Sheriff's response does not provide any insight on what he or any other policymaker did with the information.

The Sheriff raised a myriad of objections in his response to the Interrogatory, stating that the request was overbroad, vague, and unduly burdensome. The only detail the Sheriff provides to support his objections is that he would have to review approximately 500 or more employee files to respond. However, the information sought is pertinent to Sowell's claim, as she may be required to prove that the constitutional violation was the result of an official policy or practice or the direct result of a decision by a policy maker. *See **Pembauer v. City of Cincinnati***, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Nor has he proposed alternatives, such as making the files available for inspection. Moreover, Sowell stated that there were approximately ten suicides within the time period for which the documents are sought, thereby limiting the scope. The Sheriff, who carries the burden of proof, has not demonstrated that the

burden outweighs Sowell's need for the information. For these reasons, the Sheriff must provide a more specific response to Interrogatory No. 5.

Sowell also asks Southlake to produce the mortality review it conducted. At her deposition, Sherry Oman, a representative of Southlake, stated that she believed that Southlake performed a mortality review of Odumabo's death. However, Oman never saw the review, and she testified that she only knew of it because she was told my former Southlake employees that some type of review had been conducted. Southlake responded that it does not possess a mortality review. The court cannot compel a party to produce something that does not exist, and based solely on Oman's testimony, it is not certain that the requested report does in fact exist. *See Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp*., 222 F.R.D. 594, 598 (E.D.Wis. 2004) ("A party need not produce documents or tangible things that are not in existence or within its control. It is sufficient that the discovered party respond by saying that a document or tangible thing is not in existence."). If, however, Southlake prepared any report, regardless of its name, it must turn over the report.

Sowell tendered requests to admit on Southlake, inquiring about its review of Odumabo's death. In response to several of the requests, Southlake stated that the terms "mortality review" and "psychological autopsy" were ambiguous and subject to multiple reasonable interpretations. However, Southlake's own expert used the term "mortality review" in her deposition, and a defense expert presented by the Sheriff for a deposition stated that he had performed many "psychological autopsies". Southlake further argues that through its representative, it did not have any personal knowledge of the contents of any review that was performed.

Because Southlake's own representative used the term "mortality review", the court is

not convinced that Southlake did not understand the term. Southlake later turned the tables and stated that it did not have knowledge of whether any kind of review actually was conducted because its representative was not present and had not seen a copy of the review. The court finds it interesting that Southlake relies on its expert's lack of knowledge of whether a review was conducted, but not her knowledge of what was meant by "mortality review".

Turning to Southlake's objection that it cannot respond because its representative does not have personal knowledge of whether any review was performed, Federal Rule of Civil Procedure 36(a)(4) states that "[i]f a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it. . . . The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny."

Southlake did not satisfy the requirements of Rule 36(a)(4) in its response to Sowell's Request for Admission. Southlake stated only that the terms were ambiguous and did not assert that it lacked knowledge to answer at the time it responded. However, it is not clear from its response that Southlake made a reasonable effort to obtain the information. Moreover, the information is entirely within Southlake's control. As it stands, Southlake's responses are insufficient. Southlake must admit or deny the statements, and if after a reasonable inquiry, it cannot respond, it must explain the basis of its inability to admit or deny the statements.

Sowell also requested numerous documents she learned of through the depositions she took, including monthly reports kept by Southlake that recorded mortalities at the jail, a notebook kept by Patricia Kerr related to her work at the jail, time sheets on which Southlake

recorded the inmates its employees saw, the research and writing Dr. Periolat testified about at

his depsoition, the tabulated sheets that recorded the number of visits by each Southlake doctor

per patient, and invoices that Dr. Periolat gave to Southlake for his work.  When the parties

conferred, they reached an agreement on some of the document requests.  The parties continue to

dispute whether Southlake must produce the reports that documented monthly and yearly

statistics regarding suicides and attempted suicides, the timesheets on which the Southlake

defendants recorded which inmates they saw, and the tabulated sheets that recorded the number

of visits by each Southlake doctor per patient.  Southlake states that it no longer possesses some

of the documents Sowell seeks because they were left behind when Southlake's relationship with

the jail was terminated.  The court cannot compel Southlake to produce documents that no longer

exist.  *See **Hagemeyer***, 222 F.R.D. at 598.  However, it is not clear that all of these documents

are outside of Southlake's possession at this time.  The court **DIRECTS** Southlake to produce an

affidavit stating that it no longer has access to these files and to describe where, if anywhere,

Sowell could gain access to the materials.

Finally, Sowell asked the Sheriff to produce its original file on Odumabo.  In response,

the Sheriff agreed to make the file available at the Sheriff's Department.  Sowell agrees that this

is an acceptable solution.

Dominguez also filed a motion to determine the sufficiency of Sowell's responses to his

first request for admissions.  Dominguez first complained that Sowell's response to his third

request to admit, which asks whether Odumabo was placed in the custody of the U.S. Marshal's

Service, was inadequate and evasive.  However, the court disagrees.  Sowell admitted that

Odumabo was placed into the Marshal's custody on April 26, 2007.  However, she gave more

information than requested and clarified that Odumabo was in their custody during the time he was not detained at the Lake County Jail. The court finds this response sufficient as it admits what Dominguez asked but provides clarification on the timing. Dominguez even stated in his brief that "when Odumabo was arrested, who arrested him, and whose custody he was in following his arrest are relevant and material to the issues of the case." (Dft's Br. p. 6).

Dominguez also requested that Sowell admit or deny that Odumabo was born in Nigeria, was a citizen of Nigeria, was not born in the United States, and was not a naturalized citizen of the United States. Sowell objected on the issue of relevance. Dominguez contests that the information is relevant to show both that Odumabo lied when he appeared in front of Judge Cherry and to contest Sowell's credibility that she did not know that Odumabo was a citizen of Nigeria. Sowell argues that this information would not help on either front because it is irrelevant whether Odumabo lied to Judge Cherry about his citizenship because it provides no insight on whether the defendants failed to provide the appropriate attention to Odumabo when he was in their care. Furthermore, the information could not discredit Sowell because she did not testify that Odumabo was a citizen of Nigeria or the United States. Rather, she stated that she was unsure of his citizenship.

Although the likelihood that Odumabo's citizenship may shed light on either his credibility or Sowell's appears somewhat attenuated, the scope of discovery is intended to be construed broadly. It is possible that the information could help prove that Odumabo's statements concerning his intent to commit suicide could not be taken seriously or perhaps, with other evidence, that Sowell was aware of Odumabo's citizenship, which may affect her credibility. Sowell has not demonstrated that there is no conceivable correlation, and due to the

broad scope of discovery, the court ORDERS Sowell to respond.

Based on the foregoing, the Motion to Compel Discovery [DE 116] is **GRANTED** and the Motion to Determine Sufficiency of Plaintiff's responses to Defendant Dominguez's First Request for Admissions [DE 118] is **GRANTED IN PART** and **DENIED IN PART**.

ENTERED this 30th day of October, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge