**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| **TAMARRA SOWELL,** )  | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 2:09 CV 47** |
| ) | |
| **ROY DOMINGUEZ** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

Defendants Southlake Center for Mental Health, Dr. Lee Periolat, and Manuel Barragan ("Southlake defendants," collectively) have moved for summary judgment. (DE # 143.) Defendants Officer Janice Hatton, Officer Linda Riley, Sergeant R. Starkey, and Sergeant Hubner ("Jail defendants") have also moved for summary judgment. (DE # 145.) Defendants Roy Dominguez and Bennie Freeman ("Lake County defendants") have also moved for summary judgment. (DE # 147.) As explained below, Southlake defendants' motion will be **denied**. Jail defendants' motion will be **granted, in part, and denied, in part**. Lake County defendants' motion will also be **granted, in part, and denied, in part**.

In addition, Southlake defendants have also filed a Rule 56 motion to strike portions of plaintiff's response to defendants' motion for summary judgment. (DE # 175.) That motion will be **denied.**

## I.     BACKGROUND

The facts discussed herein are either undisputed, or, when in dispute, resolved in favor of the non-moving party, plaintiff Tamarra Sowell. *See Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). Sowell filed a complaint as "personal representative, Administrator for the Estate, and on behalf of the heirs of Adekunle Odumabo," who is deceased. (DE # 24 ¶ 1.)

   A.     *Odumabo's Arrest and Arraignment on April 27, 2007.*

On April 26, 2007, Odumabo was arrested by the U.S. Marshals Service on charges of violating the terms of his supervised release while facing federal fraud charges. (transcript *United States v. Odumabo,* 2:04-cr-0087-JTM-PRC, Apr. 29, 2007, DE # 149-3 at 2-3.) That same day, Odumabo appeared before Magistrate Judge Paul R. Cherry for arraignment and an initial hearing on the superceding indictment filed in that case. (*Id.*) During the hearing, Odumabo made several suicidal statements in open court, including the following:

- "If they like, they can just end my life right here in court instead of wasting the government's funding."

- "It is very unfortunate this thing happened. . . and I'm ready to give my life for it . . . Right now. It is worthless."

- "I would really like to just make my peace with the Lord, maybe by poisoning, by firing squad, whatever it takes."

- "I just want to get this life over with. I'm just done, I'm done."

- "I got to spend two years with my son. That's enough. . . You can take my life."

- "I wish I was dead . . . I'm willing to meet the lord."

*(See id.)*

In light of these statements, Judge Cherry ordered the U.S. Marshals to notify Lake County Jail that Odumabo had made several suicidal statements in the courtroom and that he should be appropriately monitored for a suicidal condition. (*Id.* at 15.)

B.      *Odumabo Placed on Suicide Watch at Lake County Jail*

Odumabo was remanded into custody at the Lake County Jail (the "Jail") on the same day of his arraignment. (DE # 149-7.) The U.S. Marshals informed the Jail that Odumabo was suicidal and this was reflected in the notes of the intake nurse. (*Id.* at 3 ("Per paper from Marshals, Pt. is suicidal").) At around 5:30 p.m. that same day, Odumabo was interviewed by Patti Kerr, a Southlake crisis counselor. (*Id.*) Kerr recorded on Odumabo's chart that he "had stated in court in front of officers, 'kill me, shoot me, why waste tax payers money over a fraud charge.'" (*Id.*) She also noted that he currently denied having any suicidal thoughts. (*Id.*)

Kerr classified Odumabo as "MH5 Full Suicide Precautions,"[1] placed him on suicide watch, and referred his case to Dr. Periolat, Southlake's psychiatrist at the Jail. (*Id.*) On suicide watch, Odumabo was placed in a cell that was equipped with a surveillance camera, he was given a paper gown and paper blanket, and all sharp

---

[1]"MH5 is the designation to note 'severe impairment-transfer to psychiatric unit . . . acute situational crisis.'" (Pl. Exhibit B, Dr. Gunter Report/Declaration; DE # 167-2 at 6.)

3

objects, personal clothing and belongings were removed from his cell. (DE # 167-1 at 54-55.)

The following afternoon, Odumabo was visited by Manual Barragan, a "Crisis Intervention Specialist" who had been employed by Southlake at the Jail since 1989. (DE ## 149-7 at 3; 143-3 at 8.) Notwithstanding his title, Barragan was not a licensed mental health practitioner. (DE # 167-1 at 49-51.) Neither did he have a college degree or any formal mental health education. (*Id.*) He was, however, a "Certified Correctional Health Practitioner." (DE # 143-3 at 36.) The requirements for becoming a CCHP include passing a test and annually completing eighteen or more hours of continuing educational classes.  (DE # 167-1 at 48.) Barragan also received informal on-the-job training by working under a licensed social worker at the Jail and the psychiatrist, Dr. Periolat. (DE # 143-3 at 9-10.)

Barragan interviewed Odumabo by speaking through an open slot in the door of Odumabo's cell. (DE # 167-1 at 15-16.) Barragan recognized that this manner of interviewing inmates could lead them to be less forthcoming given that "their business" could be overheard by other people. (*Id.* at 43.) Nevertheless, through the course of his interview, Barragan learned that Odumabo was angry about being in jail and in particular about being on suicide watch. (*Id.* at 15-16.) Odumabo confirmed the statements he had made in court, but contended that he had been misinterpreted as being suicidal. (DE # 149-17 at 13.) Barragan asked him if he had any thoughts of harming himself and Odumabo replied: "No. I just want to get off this floor. Let me get

off this floor." (DE # 167-1 at 17-18.) At this time, Barragan did not conduct a formal suicide risk assessment. Instead, Barragan noted that he was able to make a "no suicide contract" with Odumabo.[2] (DE # 149-7 at 3.)

C.     *Odumabo Removed from Suicide Watch*

At the conclusion of the interview, Barragan conferred with Dr. Periolat regarding Odumabo's status on suicide watch. (DE # 167-1 at 27. ) Both offer competing characterizations of this consultation. According to Barragan, he simply relayed information to Dr. Periolat, who in turn made the decision to remove Odumabo from suicide watch. (*See id*. at 27-33.) Meanwhile, Dr. Periolat described the decision as a "joint recommendation" to which he assented. (DE # 167-8 at 50; *id.* at 42-43 ("My understanding of this [medical report] is that I agree with the fact that they put him on full suicide precautions and that I agreed that they took him off . . . . To me this means that I agree with the decision, not necessarily that I gave it to them.").)

Dr. Periolat's time at the Jail was limited to an average of 2-4 hours per week, during which time he managed a monthly case load that could exceed 100 inmates. (DE ## 167-1 at  40; 167-8 at 17; 167-5 at 12-16.) As such, he considered his role as being akin to a "consultant" (DE # 167-8 at 4), and he leaned heavily on Southlake staff such as Barragan to make treatment recommendations for inmates. (*Id.* at 32-33, 52.)

_____

[2] However, plaintiff's mental health expert, Dr. Gunter, disputes both the overall efficacy of "no-harm contracts" and whether Barragan and Odumabo actually formed such a "contract." (DE # 167-2 at 15-16.)

Dr. Periolat was aware that Barragan was not a licensed clinician and that he did not have any formal training. (*Id.* at 6-7.) Yet, Dr. Periolat also believed from working with Barragan that he was well-qualified to make suicide assessment recommendations and had done so "hundreds" of times over the course of their professional relationship. (*Id.* at 52.) In Dr. Periolat's opinion, it is common for jail psychiatrists to rely on recommendations from staff such as Barragan, even though psychiatrists would not do so outside of the jail context. (*Id.* at 54.)

The upshot is that, on Friday, April 28, 2007, following Barragan's telephone conversation with Dr. Periolat, Odumabo was removed from suicide watch. (DE # 143-3 at 28.) This meant that he was allowed to have normal clothes and bedding, hot meals, and "range" time outside of his cell. (*Id.* at 29.) He was otherwise ordered to remain under observation in a camera cell until he met personally with Dr. Periolat the following week. (*Id.*)

D.    *Odumabo Hangs Himself in the Lake County Jail*

On Monday, April 30, 2007, at 6:20 a.m., Odumabo was found dead in his cell, having hanged himself with his bed sheet. (DE # 149-7 at 6, 8.) The two preceding days had passed largely without incident. (*See* DE # 149 at 11-21.) However, at around 1:00 a.m., defendant Officer Hatton learned that Odumabo had covered up his cell camera. (DE # 167-14 at 2-5.) She ordered Odumabo to uncover the camera and he complied with her directive. (*Id.*) Hatton then resumed her post in the control booth, where she

was responsible for monitoring the rotating cameras on the fourth floor.[3] (DE # 167-10 at 3.)

At the outset of her shift, Hatton was aware that Odumabo had been on suicide watch and that he was under observation in a camera cell for that very reason. (*Id.* at 9-11.) She also knew from her experience that an inmate covering his camera was potentially a sign that he will attempt to commit suicide. (*Id.* at 21.) A few hours later, Hatton observed Odumabo wearing his bed sheet around his shoulders, knotted in the front, in the fashion of a cape. (*Id.* at 22-23.) She was also aware that an inmate could use a bed sheet to harm himself. (*Id.* at 7.) However, Hatton did not consult any fellow officers or notify any medical personnel of Odumabo's behavior. (*Id.* at 25.)

Hatton remained on watch over the next few hours, during which time she and another officer made routine rounds and observed Odumabo dozens of times. (DE # 149-12 at 50.) Odumabo was observed sleeping. (DE # 149-26 at 6.) At another point, he asked Hatton what time it was and she told him. (DE # 149-21 at 33-34.) He was served breakfast around 4:45 a.m., asked for, and received, an extra carton of milk. (DE # 149-26 at 6-7.)

However, not long thereafter, he again covered up the camera to his cell. (DE # 167-10.) This time, however, it went unnoticed. Thus, it is not clear when he covered up his camera and how long he was out of surveillance. It was during this interval that

---

[3]The monitor cycled through 26 cameras that appeared on screen for roughly 3 seconds at a time. (DE # 167-10 at 3-4; DE # 167-15 at 7-8.) Thus each camera view would appear on the monitor roughly once every minute and a half.

Odumabo took his own life. He was discovered by an officer making the rounds at 6:20 a.m. (DE # 149-26 at 76.)

E.    *The Cox Report*

Between 2003 and 2006, five other inmates had committed suicide while in custody at the Lake County Jail. (*See* DE # 167 at 16-18.) Sheriff Roy Dominguez was made aware of each suicide. (DE # 167-23 at 25-26.) After the last of those suicides, in September of 2006, Dominguez asked the National Institute of Corrections ("NIC"), an arm of the U.S. Bureau of Prisons, for assistance in evaluating and improving the suicide prevention policies at the Jail. (DE # 153 at 25; DE # 167 at 18.)

In November of 2006, Judith Cox, a corrections expert from the NIC conducted an onsite inspection of the Jail. (DE # 153 at 26; DE # 167 at 19.) On December 3, 2006, Ms. Cox delivered a written report with her findings and recommendations. (DE # 167-24.) Dominguez and Southlake administrators received copies of this report. (DE # 167-23 at 36; DE # 167-5 at 2, 3, 9.) Cox's findings highlighted several areas where she recommended that the Jail implement changes to prevent further suicides.

One recommendation was that mental health evaluations "should only be provided by licensed mental health staff." (*Id.* at 10.) This recommendation is consistent with guidance from the National Commission on Correctional Health Care (NCCHC), the Jail's accrediting body.[4] (*Id.* at 1; DE # 167-4 at 9.)

---

[4]Per the NCCHC, "qualified mental health professionals" include "psychiatrists, psychologists, psychiatric social workers, psychiatric nurses, and others who by virtue of their education, credentials and experience are permitted by law to evaluate and care

The Cox Report also touched upon the topic of suicide risk assessments. Under the existing practice, according to Barragan, Southlake staff did not conduct formal suicide risk assessments. (DE # 167-4 at 41.) Cox recommended that the Jail utilize a "Structured Suicide Screening Form" and that the criteria for this form should be reviewed and approved by the psychiatrist. (DE # 167-24 at 8.) A positive answer to these questions would trigger intervention from someone higher up than the front line worker. (*Id.*) Cox attached a sample of this form in the appendix to her report. (*Id.*)

During her inspection, Cox observed the Jail's practice of conducting mental health screenings in public areas. (*Id.* at 7.) In response, she recommended that such screenings take place in a more private setting, noting that "[w]ithout such an atmosphere for the screening process, the validity of inmate responses is highly questionable." (*Id.* at 8.)

Cox also recommended that the Jail implement "treatment plans" for the inmates on suicide watch. (*Id.* at 12-13.) NCCHC standards also call for such plans. (DE # 167-4 at 4-6.) Along those same lines, Cox also made recommendations to improve the communication between Jail staff and mental health staff. (DE # 167-24 at 18.)

F.     *Response to the Cox Report*

At the conclusion of Cox's inspection, Dominguez, Warden Karen Jones, and Southlake administrators and staff participated in an exit interview with Cox. (DE # 153-20 at 8-14.) After this meeting, Dominguez ordered Jones to form a suicide

for the mental health needs of patients." (DE # 167-4 at 16.)

response team or committee. He attended at least one meeting of this team. (*Id.* at 24-26, 31-32; DE # 167-23 at 7.) However, he testified that he could not remember who was part of this team, what was discussed at the meeting, whether the team met more than once, or whether the team effectuated any changes with regards to suicide. (DE # 167-23 at 7-11.)

A month later, Dominguez fired Jones and hired Bennie Freeman as the new warden in January of 2007. (DE # 167-31 at 3.) Freeman did not have experience in jail administration. (DE # 167-27 at 9-10.) A police officer for most of his career, Freeman's only jail-related experience was the four years that he worked as a booking/correctional officer from 1985 to 1989. (*Id.*) Dominguez provided him with no instruction on running the Jail and did not discuss suicide and suicide prevention with Freeman. (*Id.* at 7, 12, 16-17.) No changes were made to the Jail's suicide prevention policies or practices while Freeman was warden. (*Id.* at 14.)

No one showed the Cox report to Dr. Periolat or discussed the findings and recommendations with him prior to Odumabo's suicide. (DE # 167 at 56-57.) Similarly, no one showed or discussed the report with Barragan either. (DE # 167-33 at 5-6.) No treatment plan was ever created for Odumabo. (DE # 149-7.) Barragan did not perform a formal suicide risk assessment to evaluate Odumabo's status on suicide watch. (*Id.*) Sherry Oman, Southlake's Vice President for Clinical Administration testified that she did not participate in any meetings regarding the Cox Report and could not recall

whether any changes were made in response to the report.[5] (DE # 167-5 at 10-11.) Southlake terminated its contract at the Jail on June 30, 2007. (*Id.* at 17.)

## II.  LEGAL STANDARD

Defendants have moved for summary judgment. Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010). "[T]he burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. Once the moving party has met his burden, the non-moving party must identify specific facts establishing that there is a

---

[5]Oman is Southlake's Rule 30(b)(6) designee regarding Southlake's training, policies, and protocols for suicide prevention at the Jail. (*See* DE # 167-34.)

genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); *Palmer v. Marion County,* 327 F.3d 588, 595 (7th Cir. 2003) (citing *Celotex,* 477 U.S. at 324). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson,* 477 U.S. at 248; *Donovan v. City of Milwaukee,* 17 F.3d 944, 947 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966 (7th Cir. 1998).

## III.   DISCUSSION

Pretrial detainees such as Odumabo are protected from cruel and unusual punishment by the due process clause of the Fourteenth Amendment. *Cavalieri v. Shepard,* 321 F.3d 616, 620 (7th Cir. 2003). To succeed on her claims, plaintiff must demonstrate two elements: (1) the injury to Odumabo was sufficiently serious and a substantial risk to his health or safety, and (2) that the individual defendants were deliberately indifferent to Odumabo's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003).

The first element has been met in this case as suicide is an objectively serious harm. *Matos,* 335 F.3d at 557; *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). The dispute in this case centers on whether each individual defendant was deliberately indifferent, meaning that they knew Odumabo was at a substantial risk of committing suicide and that each individual defendant intentionally disregarded that risk. *Matos,*

335 F.3d at 557 (citing *Estate of Novack v. County of Wood*, 266 F.3d 525, 529 (7th Cir.

2000). "Negligence - even gross negligence - is insufficient to meet this standard, but the

plaintiff is not required to show intentional harm." *King v. Kramer*, 600 F.3d 1013, 1018

(7th Cir. 2012) (citing *Farmer*, 511 U.S. at 836). Rather the standard for deliberate

indifference is comparable to criminal recklessness. (*Id.*)

    *A.    Manuel Barragan*

    For Barragan to be liable under the Fourteenth Amendment, he must have been

"cognizant of the significant likelihood that an inmate may imminently seek to take his

own life and must fail to take reasonable steps to prevent the inmate from performing

this act." *Novack*, 226 F.3d at 529. Barragan has moved for summary judgment arguing

that he was not aware of Odumabo's risk for suicide. (DE # 144 at 12.) Barragan also

raises the defense of qualified immunity. (*Id.* at 23.)

    Viewing the evidence in the light most favorable to plaintiff, *Lopez v. City of

Chicago*, 464 F.3d 711, 715 (7th Cir. 2006), there are sufficient facts for a reasonable jury

to conclude that Barragan was aware of a substantial risk that Odumabo would attempt

to commit suicide. To begin with, Barragan knew that Odumabo was on full suicide

watch. He knew that the reason Odumabo was on suicide watch was because he had

made suicidal statements in court the day before. Barragan was also privy to the

information on Odumabo's chart including Patti Kerr's notes wherein she documented

the fact that the U.S. Marshals described him as "suicidal" and that "[Odumabo] had

stated in court in front of officers 'kill me, shoot me, why waste tax payers money over

13

a fraud charge.'" Kerr had also categorized Odumabo as "MH5" which represents an

"acute situational crisis."

Barragan relies on *Matos*, 335 F.3d 553 (7th Cir 2003), and *Minix v. Canarecci*, 597

F.3d 824 (7th Cir. 2010) to support his contention that he was not subjectively aware of

the risk of suicide. (DE # 144 at 12-16.) Both cases are distinguishable.

*Matos* involved a suicide by an inmate who had recently transferred between two

correctional institutions. 335 F.3d at 555. During intake at the first facility he had

reported suffering from "manic depression-schizophrenia" and self-reported a previous

suicide attempt from years earlier. *Id.* at 554. Yet, at the second institution, he did not

disclose that information and there was no evidence that his original file was

transferred to the second institution. *Id.* at 555. All the while, he denied having any

suicidal thoughts and none of the mental health staff considered him to be suicidal. *Id.*

The Seventh Circuit held that the jail staff was not actually aware of the risk of the

suicide, noting:

> "First, Matos never told any of the defendants that he felt suicidal or
> depressed beyond his control during his incarceration at [the second
> facility] despite having been asked the question numerous times during
> intake interviews, psychological examinations, crisis counseling, and
> physical exams. And second, not one of the defendants who interviewed
> or examined Matos - each of whom was trained in psychology, social
> work, medicine or crisis response - ever determined after seeing him that
> he exhibited suicidal or delusional tendencies, or that he needed to be
> placed on suicide watch."

*Id.* at 557.

The present case is quite different from *Matos*. Here, the reports of Odumabo's suicidal in-court statements, and Judge Cherry's concerns were effectively conveyed to the Jail by the U.S. Marshals and were reflected in Odumabo's medical chart. Moreover, crisis counselor Kerr, after meeting with Odumabo, classified him as MH5 and ordered him to be placed on suicide watch. Thus, unlike *Matos*, Odumabo's suicide risk was both communicated to Jail staff and corroborated by at least one other member of the mental health staff. Barragan was aware of these facts.

In *Minix,* an inmate was placed on suicide watch after disclosing a previous suicide attempt and the fact that he took prescription medication to inhibit suicidal thoughts. 597 F.3d at 828. Days later he was interviewed by a mental health contractor who found him to be "generally polite and cooperative" and filed a report indicating that the inmate "denied having suicidal thoughts." *Id.* Crucially, the mental health contractor had not reviewed the inmate's file and was not aware that he was on suicide watch. *Id.* Based in part on the contractor's report, another nurse in the facility removed the inmate from suicide watch and he ultimately committed suicide a month later. *Id.* at 829

The Seventh Circuit affirmed the grant of summary judgment for the contractor holding that she lacked knowledge of the likelihood that the inmate would "imminently seek to take his own life." *Id.* at 831. Of particular importance, it was "undisputed that [the contractor] did not know about [the inmate's] suicidal history or even about his placement on the suicide watch." *Id.* The court rejected the notion that she should have

"probed more deeply" into his psychological history, as such alleged incompetence would be, at worst, negligence, and far below the standard for deliberate indifference. *Id.* at 831-32.

Here, Barragan *did* know that Odumabo had made suicidal statements in open court the prior day and that Barragan was placed on full suicide precautions as a result. As such, he cannot rely on *Minix* to stand for the proposition that he was not actually aware of the risk of suicide.

Barragan places great emphasis on Odumabo's truthful affect and his denials of suicidal thoughts during his interview. (DE # 144 at 16.) This, at least, is one area of commonality between this case and *Matos* and *Minix.* However, neither case stands for the proposition that an inmate's present denial of suicidal thoughts dispositively negates a defendant's awareness of a suicide risk. Meanwhile, a number of cases have held that a question of fact can exist even when the inmate has made such a denial or otherwise represented that they were non-suicidal. *See Cavalieri v. Shepard,* 321 F.3d 616, 619-20 (7th Cir. 2003); *Mombourquette ex rel. Mombourquette v. Amundson,* 469 F. Supp. 2d 624, 644, (W.D. Wis. 2007); *Perez v. Oakland Cty.,* 466 F.3d 416, 425-26 (6th Cir. 2006); *Wever v. Lincoln Cty., Nebraska,* 388 F.3d 601, 604-05 (8th Cir. 2004); *Robey v. Chester Cty.,* 946 F. Supp. 333, 337-38 (E.D. Pa. 1996). Ultimately it is a question for the jury to determine what weight to place on Barragan's testimony regarding his interview with Odumabo and the inferences to be drawn therefrom. Taken in the light most favorable

to plaintiff, a jury could conclude that, notwithstanding Odumabo's denials, Barragan was aware of a substantial risk of suicide.

If Barragan was aware of a substantial risk, it was incumbent upon him to take "reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). Here, too, there is a question of fact that requires resolution by a jury. Specifically, there is a dispute over the nature of Barragan's role and the extent to which he is responsible for the decision to remove Odumabo from suicide watch. Barragan contends that he could not have been deliberately indifferent because he "did not have the authority" to make that call, but instead "simply passed along his observations to Dr. Periolat." (DE # 144 at 16.)

However, Dr. Periolat's testimony undermines this contention. To begin with, Dr. Periolat testified that he relied heavily on staff such as Barragan to make treatment recommendations for inmates with mental health needs. He had worked with Barragan for more than 25 years and believed that he was well-qualified to make suicide assessments. Given his extensive caseload, and limited hours on site, he considered his role as that of a "consultant" to staff such as Barragan. (DE # 167-8 at 4.) Dr. Periolat believed that this arrangement was common in the jail context even though it would not be practiced by psychiatrists in an ordinary professional setting. Thus a reasonable jury could conclude that Dr. Periolat and Barragan had developed a working relationship that effectively delegated this decision to Barragan.

At the very least, there is evidence to support the conclusion that it was a joint decision between Barragan and Dr. Periolat. (*See* DE # 167-8 at 50 ("Q: The two of you made a joint recommendation to take a step back from full suicide precautions; is that correct? A: Right.").) Drawing the inferences in plaintiff's favor, the court cannot conclude that Barragan was only a passive conduit of information and had no role in the decision to remove Odumabo from suicide watch.

If a jury was to conclude that Barragan made the decision to remove Odumabo from suicide watch, it could also reasonably conclude that doing so manifested deliberate indifference. Aside from arguing that the decision rested with Dr. Periolat alone, Barragan makes no other argument that he was not deliberately indifferent. Indeed, if Barragan was aware of the risk of suicide, providing Odumabo with the instrumentalities to harm himself, by removing him from suicide watch, cannot be said to be a reasonable response.

This case presents a comparable scenario to other cases finding deliberate indifference where a defendant is aware of the risk of suicide and fails to take action, leaving an inmate with the materials to harm himself. *See Belbachir v. Cty. of McHenry*, 726 F.3d 975, 981-82 (7th Cir. 2013) (Nurse who knew of inmate's suicide risk was deliberately indifferent when she did not put inmate on suicide risk of transfer her to a mental hospital); *Terry v. Rice,* No. IP 00-600-C-H/K, 2003 WL 19281818, at *15 (S.D. Ind. Apr. 18, 2003); *Mombourquette*, 469 F. Supp. 2d at 646. Here, plaintiff faults Barragan not for his inaction, but for affirmatively removing Odumabo from suicide watch. In

either case, the end result is the same. If Barragan was aware of the risk, he could have abated that risk, by simply leaving Odumabo on suicide watch with paper clothing and bedding. *See Belbachir* 726 F.3d at 981 ("[W]hen the adverse consequence is very great, the failure to take a simple, inexpensive, obvious, and indeed prescribed measure to avert it is inexcusable.") Based upon the facts at hand, a jury could conclude that Barragan was deliberately indifferent, and therefore he is not entitled to summary judgment.

B.      *Dr. Periolat*

Dr. Periolat has moved for summary judgment on the basis that he was not deliberately indifferent to Odumabo's medical needs when he agreed to remove him from suicide watch. (DE # 144 at 16.) He also raises a defense of qualified immunity alongside Barragan. (*Id.* at 23.)

"For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008). "The prison physician, as the inmate's acting primary care doctor, is free to make his own independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the

physician's professional judgment and does not go against accepted professional standards." *Id.* at 1074.

Dr. Periolat never personally met with Odumabo. Rather, all of his information was received through Barragan and other Southlake staff. In fact, Dr. Periolat asserts that he has no memory of Odumabo or of talking to Jail staff about him. (DE # 167-8 at 2, 41) Nevertheless, Barragan testified that when he spoke to Dr. Periolat, he related the information that he learned about Odumabo. (DE # 167-1 at 32.) According to Barragan, Dr. Periolat would have also been consulted when Kerr initially placed Odumabo on suicide watch upon his arrival. (*Id.*) Thus Dr. Periolat was apprised of at least the basic facts regarding Odumabo's suicide risk, including the fact that Odumabo made suicidal statements in court, that the court and the U.S. Marshals had reached out to the Jail about those statements, that Odumabo was angry about being in jail, and that he wanted to be taken off of suicide watch. (*Id.*) He would also have been aware that Odumabo had denied having suicidal intentions to Barragan. (*Id.*)

Dr. Periolat briefly argues, citing *Minix* and *Matos*, that he was not subjectively aware of the risk of suicide. (DE # 144 at 17-18.) As discussed with regards to Barragan, both cases are distinguishable and offer little support here as well. Dr. Periolat had at least as much information as Barragan had related to him. He also would have been consulted the prior day when Kerr classified Odumabo as "MH5." (DE # 153-8 at 3.) Indeed, the outcome of that consultation was that Dr. Periolat approved placing

Odumabo on suicide watch. (DE # 167-8 at 41 ("Q: So you approved full suicide precautions for Mr. Odumabo; is that correct? A: Yes.").)

Dr. Periolat focuses on the fact that he "was informed by an experienced and trusted colleague [Barragan] that Odumabo was alert and cooperative, and that he exhibited no signs of being suicidal." (DE # 144 at 17-18.) Yet, much of the information that Barragan would have related to him, including the fact that Odumabo made suicidal statements in open court, would have alerted Dr. Periolat to the risk of suicide. In addition, just one day earlier, one of his other colleagues, Patti Kerr, had interviewed Odumabo and placed him on full suicide precautions. Dr. Periolat also knew that the court and the U.S. Marshals had referred their own concerns to the Jail regarding the Odumabo's suicide risk.

The fact that Barragan may have opined that Odumabo was lucid, cooperative and denied suicidal intentions, does not negate the body of facts that pointed towards the risk that Odumabo was suicidal. A jury could conclude that, based upon the information available to him, Dr. Periolat was subjectively aware of the risk of suicide.

The main thrust of Dr. Periolat's argument is that he was not deliberately indifferent because he exercised his medical judgment and applied it to the facts that he had. He cites *Estate of Cole v. Fromm,* 94 F.3d 254 (7th Cir. 1996), in which the court upheld the grant of summary judgment for a psychiatrist who classified a detainee as "potentially suicidal" instead of "high risk." (DE # 144 at 18.) The difference between those two classifications resulted in the detainee having access to the materials with

which he ultimately took his own life. The plaintiffs faulted the psychiatrist for failing to classify the detainee as "high risk" in light of the facts which, according to the plaintiffs' expert, made obvious the risk of suicide. *Fromm*, 94 F.3d at 261. The Seventh Circuit held that the expert's opinion could not be used to impute awareness of the risk of suicide, because doing so would improperly supplant the psychiatrist's subjective medical judgment. *Id.* at 261-262.

Dr. Periolat's reliance on this *Fromm* is misplaced. The psychiatrist in that case conducted multiple in-person evaluations of the detainee and fully reviewed his medical background. Thus, her "subjective medical conclusion" was based upon her own research and personal observations in the field. Accordingly, the plaintiffs could not satisfy the deliberate indifference standard where their theory of the case was largely an exercise in second-guessing the psychiatrist's medical judgment through their own expert's testimony. As the Seventh Circuit concluded, they had failed to present evidence that the classification as a "potential suicide" risk was such a departure from accepted professional judgment "as to demonstrate that [the psychiatrist] did not base her diagnosis on such judgment." *Id.* at 263.

Here, the essence of plaintiff's claim is not just that she disagrees with Dr. Periolat's medical judgment. Rather, plaintiff's theory is that Dr. Periolat's decision was rendered without gathering basic information such that the decision was not a medical judgment *at all*. Unlike the psychiatrist in *Fromm*, Dr. Periolat never personally

interacted with Odumabo. Nor did he review Odumabo's medical files or gather any other information about him before accepting Barragan's recommendation.

The common thread in Dr. Periolat's testimony is that he consistently minimizes his own role in making the decision to remove Odumabo from suicide watch. (*See* DE # 197-8 at 42 ("my understanding of this [medical chart] is that I agree with the fact that they put him on full suicide precautions and I agree that they took him off, . . . . To me this means that I agree with the decision, not necessarily that I gave it to them."); *id* at 49 ("I was a consultant to them."); *id.* at 50 ("Q: The two of you made a joint recommendation to take a step back from full suicide precautions; is that correct? A: Right.").) This is a far cry from the psychiatrist in *Fromm* who conducted her own examinations and brought the full weight of her medical expertise to bear on the risk classification. As discussed above, there is a genuine dispute as to whether it was Barragan who truly made the decision to remove Odumabo from suicide precautions. In that scenario, Dr. Periolat's acquiescence to Barragan's non-medical judgment would not enjoy the same deference as the exercise of his own medical judgment.

Even if the jury concluded that the decision was Dr. Periolat's alone, it could still find that he did not actually apply his medical judgment in reaching that decision. Plaintiff cites to comparable cases where courts have found sufficient evidence for deliberate indifference by medical professionals who make decisions after only a cursory examination. For example, in *Greason v. Kemp,* 891 F.2d 829, 835 (11th Cir. 1990), the Eleventh Circuit held that a reasonable jury could find deliberate indifference where

jail psychiatrist "abruptly discontinued" an inmate's anti-depression medications after only spending a few minutes with the patient and without reviewing his "clinical file or conducting a mental health examination." Taking the facts in the light most favorable to plaintiff, a jury could reasonably determine that Dr. Periolat made the decision to remove Odumabo from suicide watch in a similarly cursory manner.

Likewise, in *Mace v. Johnson*, No. 11-0477, 2014 WL 538580 at *11 (D. Minn. Feb. 11, 2014), the district court found that an issue of fact existed where a doctor discontinued an inmate's pain medications without taking adequate steps to get relevant medical information. In that case, the doctor was concerned that the inmate might abuse or try to sell the pain medications. *Id.* at *2. However, he did not meet with the inmate in person or review his medical file. *Id.* Instead, he relied only upon information relayed over a telephone call with a nurse. *Id.* The court held a jury could find that the doctor's decision, made without any medical information, was not a medical judgment, thus precluding summary judgment. *Id.* at *11. *See also Steele v. Shah,* 87 F.3d 1266, 1270 (11th Cir. 1996) (denying summary judgment where the doctor was aware that plaintiff was taking psychotropic medications in part because he was suicidal, yet he discontinued the medications without reviewing medical records and after an interview lasting less than one minute).

There is enough evidence in the record that Dr. Periolat's reliance upon and deference to Barragan, along with the failure to examine Odumabo or review his medical history amounted to something less than a medical judgment. It is, of course,

entirely possible that a jury would credit Dr. Periolat's contention that his decision

represented the genuine application of his professional judgment. However, there is

enough of a dispute regarding his role in the decision and what information he

considered before making that decision, that resolution by a jury is necessary. As such

summary judgment is also denied as to Dr. Periolat.

     C.     *Qualified Immunity for Barragan and Dr. Periolat*

Barragan and Dr. Periolat jointly raise a defense of qualified immunity. (DE # 144

at 23.) However, it is "all but certain in this circuit that private doctors providing

medical services to inmates are not entitled to assert qualified immunity." *Ford v. Ghosh,*

2014 WL 4413871, at *9 (N.D. Ill. Sept. 8, 2014) (citing *Currie v. Chhabra,* 728 F.3d 626,

631-32 (7th Cir. 2013). The Supreme Court has held that employees of privately-

operated prisons cannot assert qualified immunity. *Richardson v. McKnight*, 521 U.S. 399,

412 (1997). Though the Seventh Circuit has never "definitively decid[ed] the issue,"

*Currie*, 728 F.3d at 632, it has repeatedly signaled its inclination to side with the Sixth

Circuit in extending that holding to employees of private corporations that contract

with the state to provide medical care for prisoners. *Id.* (citing *McCullum v. Tepe*, 693

F.3d 696 (6th Cir. 2012)); *Rasho v. Elyea*, No. 14-1902, – F.3d –, 2017 WL 892500, at *7 (7th

Cir. Mar. 7, 2017); *Petties v. Carter,* 836 F.3d 722, 734 (7th Cir. 2016), as amended (Aug.

25, 2016) (en banc) ("qualified immunity does not apply to private medical personnel in

prisons"); *Zaya v. Sood*, 836 F.3d 800, 807 (7th Cir. 2016); *Shields v. Illinois Dept. Of*

*Corrections,* 746 F.3d 782, 794 n.3 (7th Cir. 2014). The Seventh Circuit's repeated

statements on this issue are sufficient guidance for the court to conclude that a qualified immunity defense is not available to Barragan and Dr. Periolat. *See Awalt v. Marketti,* 74 F. Supp. 3d 909, 932-33 (N.D. Ill.), supplemented, 75 F. Supp. 3d 777 (N.D. Ill. 2014). Accordingly, summary judgment is denied on the basis of qualified immunity.

D.    *Officer Hatton*[6]

Officer Hatton has also conceded the seriousness of the risk of suicide. (DE # 146 at 8.) Thus, her motion for summary judgment centers on whether she was aware of the risk and deliberately disregarded it. (*Id.*) She also raises a defense of qualified immunity. (*Id.* at 16.)

Hatton's main contention is that she was unaware of the risk that Odumabo would commit suicide. (*Id.* at 10.) In support of her position, she points to the fact that when she began her shift on April 29th, Odumabo had already been removed from suicide precautions and was being "housed as a normal inmate on the 4th floor." (*Id.*) Further, she points out that, over the course of her shift, Odumabo had a number of normal interactions with staff and was visually observed more than 200 times. (*Id.* at 9-10.) Moreover, she relies on the fact Odumabo was never placed back on suicide watch during the course of her shift, which to her is further evidence that he was not presenting as suicidal. (*Id.*)

---

[6]Plaintiff agrees to the dismissal of the remaining Jail defendants. (DE # 170 at 32 n.8) Summary judgment is granted in favor Officers Riley, Starkey and Hubner.

Hatton's summary of the facts elides a number of crucial points. First, it is undisputed that she knew Odumabo had recently been on suicide watch and was removed just two days prior. Moreover, she knew that he was under observation in a fourth floor camera cell because he had been on suicide watch. It is also undisputed that she observed Odumabo cover his cell camera at 1:00 a.m. She testified that she was aware from her experience that someone covering their camera is potentially a sign that they are attempting to commit suicide. She also observed Odumabo with a sheet tied across his shoulders and knew that a sheet could be used to harm himself. Plaintiff's jail expert, Martin Horn, said of this last fact: "if that wasn't a danger sign that should have been brought to the attention of other people, mental health professionals, I don't know what is." (DE # 167-12 at 2.) It is not a certainty, but a reasonable jury could look at these facts and draw the conclusion that Hatton was aware of the risk.

Perhaps most importantly, there is a factual dispute surrounding the second time that Odumabo obscured his cell camera when he ultimately took his own life. It is undisputed that the camera was covered when he killed himself. However it is unknown for how long it was covered and why Hatton did not discover this latest attempt to cover his camera. It was, after all, her responsibility to observe the cameras in the control room. As such, taken in the light most favorable to plaintiff, there is enough evidence to create a factual question around plaintiff's supposition that Hatton may have observed the second coverup, but failed to respond in a timely manner.

This last disputed fact points not just to awareness of the risk but also to the second prong of failing to take reasonable measures to abate the risk. *Farmer*, 511 U.S. at 847. If a jury credited plaintiff's theory that Hatton observed the second coverup, but failed to respond promptly, it could conclude that doing so was deliberate indifference. Even without relying on that inference, there are other facts that could support a finding of deliberate indifference. If Hatton was aware of Odumabo's suicide risk at the outset of her shift – or even after he covered up his camera the first time – a jury could find that she failed to respond reasonably.

Hatton focuses her argument on the awareness prong, so she hardly argues that she took any reasonable steps to abate the suicide risk. Plaintiff, however, points to a few simple, but crucial, steps that she failed to take in light of the risk. First, she could have alerted the medical staff after Odumabo covered his cell camera.[7] Second, she could have confiscated the bedding with which he might hurt himself. Third, and simplest of all, she could have kept Odumabo under closer scrutiny so that he would not have the opportunity cover his cell camera and commit suicide. From these omissions, a jury could conclude that Hatton was deliberately indifferent to the risk of suicide. *See Belbachir*, 726 F.3d at 981 ("[W]hen an adverse consequence is very great, the

[7]Barragan himself, later faulted the correctional staff for failing to notify the medical personnel after Odumabo covered up his cell camera. (DE # 167-6 at 13 (Barragan statement to Karas Adjusters: "had somebody been aware of an incident that occurred such as that[,] that he [Odumabo] had been covering it, I would say that they should have notified a nurse. Somebody that was here should have informed them. . . . [H]ad they called or notified somebody, you know, something should have been done.").)

failure to take a simple, inexpensive, obvious, and indeed prescribed measure to avert it is inexcusable.")

       *E.*       *Qualified Immunity for Officer Hatton*

Hatton briskly raises a defense of qualified immunity. (DE # 146 at 16.) Beyond reciting the legal standard for qualified immunity, Hatton's only argument is that she "did not act with deliberate indifference to Odumabo, acted as a reasonable correctional officer, and there was not a violation of his constitutional rights." (DE # 173 at 10.) In essence: if she is not liable for deliberate indifference, she is also, in the alternative, entitled to qualified immunity. However, the factual disputes that the court has identified above also prevent the court from granting summary judgment on the basis of qualified immunity.

"Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). A "plaintiff seeking to defeat a defense of qualified immunity must establish two things: first, that she has alleged a deprivation of a constitutional right; and second, that the right in question was 'clearly established.'" *Miller v. Harbaugh,* 698 F.3d 956, 962 (7th Cir. 2012) (quoting *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)). "In undertaking this analysis, it is not enough . . . to say that it is clearly established that those operating detention facilities must not engage in cruel or unusual punishment." *Miller,* 698 F.3d at 962. "The way that the right is translated into the particular setting makes a difference." *Id.* "The plaintiff must show that the contours of

the right are 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

There is no dispute that the right in question was clearly established in April of 2007. *See Sanville v. McCaughtry,* 266 F.3d 724, 740, (7th Cir. 2001) ("There can be little debate that it was clearly established, long before 1998, that prison officials will be liable under 1983 for a pretrial detainee's suicide if they were deliberately indifferent to a substantial suicide risk." (citation and quotation marks omitted)); *Cavalieri v. Shepard,* 321 F.3d 616, 622-23 (7th Cir. 2003). Since the court has found a factual dispute as to whether that constitutional right was violated, summary judgment is denied on the basis of qualified immunity. *DuFour-Dowell v. Cogger,* 152 F.3d 678, 680 (7th Cir. 1998) ("Because the facts are in hot dispute, the officers cannot seek pretrial refuge behind a claim of qualified immunity . . . a fact finder must decide if DuFour can prove that Morgan and Cogger acted in this fashion.").

E.     *Monell Liability for Lake County*[8] *and Southlake*

Sheriff Dominguez[9] and Southlake have each moved for summary judgment on plaintiff's *Monell* claims. (DE ## 147, 143. ) Lake County and Southlake may be liable under § 1983 for constitutional violations caused by: (1) "a governmental practice or

---

[8]Plaintiff agrees to the dismissal of her claims against Warden Bennie Freeman in both his official and personal capacity. (DE # 170 at 39 n.10; *id.* at 60.) Summary judgment is granted in his favor.

[9]Plaintiff has sued Sheriff Dominguez in his official capacity, which is really a suit against Lake County, Indiana. *Belbachir,* 726 f.3d at 982. Thus, the court will refer to "Sheriff Dominguez" and "Lake County" interchangeably.

custom that, although not officially authorized, is widespread and well settled;" (2) "an official with final policy-making authority;" or (3) "an official policy adopted and promulgated by its officers." *Thomas v. Cook Cty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2010 (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 694 (1987)).

Plaintiff is proceeding on two of the above theories. First, she alleges that Lake County and Southlake maintained widespread customs and practices that were the moving force behind Odumabo's constitutional injury. Second, she argues Dr. Periolat was Southlake's final policymaker with regards to suicide prevention for detainees at the Jail.

I.      *Widespread Customs and Practices*

Plaintiff contends that Lake County and Southlake "jointly maintained widespread deficient suicide-related customs or practices at the time of Odumabo's suicide." (DE # 170 at 33.) "To demonstrate that [a municipal entity] is liable for a harmful custom or practice, the plaintiff must show that [the municipal entity's] policymakers were 'deliberately indifferent to the known or obvious consequences.'" *Thomas,* 604 F.3d at 303 (quoting *Gable v. City of Chicago,* 296 F.3d 531, 537 (7th Cir. 2002)). "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Thomas,* 604 F.3d at 303. Additionally, for the municipality to be liable, the causal relationship between the policy or practice and the harm must be such that the policy was the

"moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 379 (1989).

It is worth pointing out that, for the purposes of this claim, it makes little difference whether the alleged deficiencies originated with Southlake or Lake County. For a *Monell* claim, "the private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009); *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012). Therefore the claims against both entities can be analyzed in conjunction.

Plaintiff alleges several policy deficiencies as the moving force behind the violation of Odumabo's constitutional rights. First, plaintiff argues that the defendants had a policy of using unqualified, non-clinical staff to evaluate suicide risk and make treatment recommendations for detainees. (DE # 170 at 34-36.) Lake County and Southlake were both aware of this practice as it was highlighted in the Cox report. Barragan was unlicensed and had no formal mental health education or training which would enable him to perform suicide assessments. Nevertheless, Dr. Periolat relied on Barragan to take on this responsibility "hundreds" of times, and believed that this was a standard practice in the jail context. There is sufficient evidence for a jury to find that this was a "cognizable policy" of the Jail. *Phelan v. Cook Cty.*, 463 F.3d 773, 790 (7th Cir. 2006).

Plaintiff also argues that the Jail had a policy of conducting mental health assessments in non-private settings. (*Id.* at 36.) The Cox Report alerted defendants to

this deficiency, noting that "[w]ithout such an atmosphere for the screening process, the validity of the inmate responses is highly questionable." (DE # 167-24 at 8.) Despite Cox's recommendation, this practice persisted at the Jail. Barragan interviewed Odumabo, publicly, through the closed door of his cell.[10] There is sufficient evidence for a jury to find that this was the policy in effect at the Jail.

Along the same lines, plaintiff asserts that the Jail's policy was deficient in their failure to use a formal suicide risk assessment. (DE # 170 at 37.) This, too was highlighted as a recommendation in the Cox Report. Defendants do not dispute that they did not use formal suicide risk assessments in their practice at the time. There is sufficient evidence for a jury to find that this was the policy in effect at the jail.

Plaintiff also argues the existence of a policy of not creating treatment plans for suicidal inmates combined with an overall lack of communications between mental health and correctional staff. (*Id.* at 38-40.) Cox highlighted the lack of treatment plans, which also fall under NCCHC standards. Cox provided recommendations to implement improved communications procedures so that important information could be shared between mental health and correctional staff. There was no treatment plan in place for Odumabo, and moreover, there was no communication regarding his status and his behavior.

---

[10]This problematic process was also brought to their attention in a 2006 letter from the NCCHC. *See* Decl. of Martin Horn, DE # 167-11 at 12 (excerpting letter: "Inmates are questioned through a cell door with at least 20 other inmates nearby").

A reasonable jury could conclude that some or all of these policies were a driving force behind the constitutional violation. A jury could look at the practice of using unqualified staff to conduct suicide risk assessments (troubling in itself) and see that it was exacerbated by the fact that the Jail did not utilize formal suicide risk assessments. The use of a formal assessment would at least increase the likelihood that one of Odumabo's responses might trigger intervention from someone higher up. Yet, even that likelihood would be decreased by the Jail's policy of conducting suicide assessments in a non-confidential setting, yielding inmate responses of questionable validity. A jury could conclude that the impact of these policies led to Odumabo being improperly assessed and removed from suicide watch when he presented a serious danger to his own health and safety.

Moreover, a jury could also see the lack of a treatment plan and communications system as a driving factor as well. Barragan's expectation was that mental health staff should be notified if a recently suicidal inmate such as Odumabo attempts to cover up his cell camera. For her part, Hatton considered Odumabo to be housed as a normal inmate. A jury could conclude that the existence of a treatment plan that defined these expectations and established communication protocols among the staff could have been instrumental in preventing Odumabo's suicide.

Plaintiff argues that there were additional deficiencies that were contained in the Cox report that were not acted upon by Lake County and Southlake. These include inadequate staffing levels (*Id.* at 37-38), the lack of "mortality reviews/psychological

autopsies" (*Id.* at 48-49), the lack of a suicide prevention program (*Id.* at 49-50) and inadequate training (*Id.* at 51-52). The court need not address each of them individually. Based upon the policies discussed above, there is sufficient evidence for a jury to find that there were numerous policies in place that, either alone or in combination, were the moving force behind Odumabo's constitutional injury.

A jury could also find that Lake County and Southlake were deliberately indifferent in that they were both aware of the risks created by their policies and failed to take appropriate steps to abate the risks. *Thomas*, 604 F.3d at 303.

There is little question that Lake County and Southlake were aware of the risks created by their policies. In the four years preceding Odumabo's death, five other inmates committed suicide at the Jail. Dominguez was aware of each of these suicides, and his response was to reach out to the Bureau of Prisons/NIC to help him improve the Jail's policies. The result of this request was a 20 page report of findings and recommendations that directly addressed a number of plaintiff's alleged policy deficiencies. Lake County and Southlake administrators received this report and attended an exit interview with Ms. Cox. As further evidence of Dominguez' awareness, at the conclusion of the exit interview, he appointed the Warden Jones to form a committee to address the suicide prevention policies and procedures at the Jail.

A jury could also find that Lake County and Southlake failed to take reasonable steps in light of the risk. To his credit, Dominguez was initially proactive in response to the pattern of suicides at the Jail; requesting the NIC study and ordering the Warden to

form a committee to review the Jail's suicide prevention policies. However there is sufficient evidence that, within a month of receiving the Cox Report, he failed to take any further steps to address the problem. Dominguez remembers but a single meeting of this committee, and even then cannot remember the personnel present at the meeting or if the committee held any subsequent meetings or implemented any changes to the Jail's suicide prevention policies.

Just a month later, Dominguez fired Jones and replaced her with a warden with no prior experience in jail administration. He did not discuss the Cox Report with Freeman and did not give him any instruction with regards to suicide prevention. There is no evidence that he made any effort to ensure that the work of the suicide prevention committee was continued under the new warden. A jury could conclude that, after taking the initial step of requesting the NIC study, Dominguez did not take a single meaningful step towards responding to the risk created by the Jail's suicide prevention policies.

A reasonable jury could also conclude that Southlake failed to take any reasonable steps in light of the risk. The evidence is undisputed that Southlake did not make any changes to its procedures in light of the Cox Report. In fact, Southlake's administration did not even share the contents of the report or discuss them with Dr. Periolat who was the lone psychiatrist at the Jail. Nor did they share the report with Barragan. Thus they did not even give their employees in the Jail the opportunity to

implement the recommendations in the report. A jury could conclude from this, that Southlake failed to respond reasonably.

Southlake points out that plaintiff's own expert estimated that it would take between 6 and 12 months for the Jail to implement the recommendations of the Cox Report (DE # 174 at 11.), whereas Odumabo's suicide was in April of 2007, only four months after Cox delivered her report. This argument misses the mark. The question is not whether defendants fully implemented the recommendations of the Cox Report. What was asked of defendants was that they take reasonable steps towards abating the risk caused by their policies. *Farmer*, 511 U.S. at 847. Plaintiff has presented evidence that Lake County and Southlake took little to no action in the wake of the Cox Report. Thus, it is a matter for the jury to decide whether defendants' efforts were adequate in light of the risk.

It is possible that a jury could agree with defendants that their initial efforts in the limited time before Odumabo's suicide show that they were not deliberately indifference. However, at this stage, drawing inferences in plaintiff's favor, it is a jury question as to whether Lake County and Southlake took appropriate steps to abate the risk.

ii.     *Policymaker Claim Against Southlake*

Plaintiff also argues that Southlake is liable under *Monell* for the acts of Dr. Periolat, who plaintiff argues had final policy-making authority over the Jail's suicide

watch procedures. (DE # 170 at 66.) Southlake does not present any argument to the contrary in their briefs. (*See* DE ## 144, 174)

To create *Monell* liability under the policymaker theory, the official in question does not have to be "a policymaker on all matters for the [entity], but . . . [only] a policymaker in [the] particular area, or on [the] particular issue. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009). Plaintiff's theory is that, while other Southlake administrators may have had policy-making authority within the broader organization, when it came to the Jail, Dr. Periolat was solely entrusted with defining the policy for when/whether to place inmates on suicide watch at the jail. (DE # 170 at 66.)

The Seventh Circuit has held that the following facts are helpful in determining whether an official is a final policymaker: "(1) whether the official is constrained by the policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011).

Plaintiff has presented evidence that Southlake did not have a written policy regarding the removal of inmates from suicide watch and that Dr. Periolat did not report to any supervisor regarding this practice. (DE ## 153-14 at 36-42; 167-8 at 54-55.) His decisions were unconstrained and not subject to any review whatsoever. As such, evidence exists to find that Dr. Periolat "was at the apex of authority" when designating

policy regarding removing inmates from suicide watch. *Vodak*, 639 F.3d at 748.

Southlake does not rebut this argument. Summary judgment is denied as to plaintiff's

*Monell* claim against Southlake under the policymaker theory.

F.      *Individual Capacity Claim Against Sheriff Dominguez*

Dominguez has also moved for summary judgment on plaintiff's claims against

him in his individual capacity. (DE # 148 at 8-13.) Both sides agree that Dominguez did

not have direct involvement in the treatment of Odumabo during his time at the jail.

(DE # 170 at 68; DE # 177 at 4.) Plaintiff nevertheless argues that Dominguez could still

be found liable in his individual capacity. (DE # 170 at 68.)

Dominguez correctly points out that § 1983 does not allow for vicarious liability

for supervisory officials. However, Dominguez can still be *directly* liable for Odumabo's

injury. "If a senior jail or prison official, including a person with final policymaking

power, is 'aware of a systemic lapse in enforcement of a policy critical to ensuring

inmate safety, his failure to enforce the policy could violate the Eighth Amendment."

*Daniel v. Cook Cty.*, 833 F.3d 728, 737 (7th Cir. 2016) (quoting *Steidl v. Gramley*, 151 F.3d

739, 741 (7th Cir. 1998)). "Similarly, if a supervisor designed or is aware of the

institution's 'deliberately indifferent policy that caused a constitutional injury, then

individual liability might flow from that act." *Id.* (quoting *Armstrong v. Squadrito*, 152

F.3d 564, 581 (7th Cir. 1998)).

The pattern of suicides at the Jail between 2003 and 2006, along with the findings

and recommendations of the Cox Report, provides sufficient evidence that Dominguez

was aware of the systemic deficiencies of the Jail's suicide prevention policies. A jury could find that those deficiencies persisted into April 2007, when Odumabo was at the Jail, and that Dominguez did not respond reasonably to those deficiencies. *Daniel*, 833 F.3d at 737. Summary judgment is denied as to plaintiff's individual capacity claims against Dominguez.

G.      *Indiana Wrongful Death Claim Against Southlake*

Southlake argues that it is entitled to summary judgment on plaintiff's state law wrongful death claim. (DE # 144 at 21-23.) Southlake originally raised this argument in its first motion for summary judgment. (DE # 46) As to that motion, the court ruled that "Sowell's claim for wrongful death is not barred by the [Indiana Medical] Malpractice Act so long as she is stating a claim for deliberate indifference and not negligence." (DE # 72 at 5.)

Here the court has found that a genuine issue of fact exists on plaintiff's deliberate indifference claims against Southlake. Therefore, the motion for summary judgment is also denied as to plaintiff's state law wrongful death claim premised on the same theory.

H.      *Motion to Strike*

Southlake has also filed a Rule 56 motion to strike certain exhibits from plaintiff's response to defendants' motion for summary judgment. (DE # 175.) Southlake asks the court to strike the expert report of Dr. Tracy Gunter (DE # 167-2) on grounds that it was not properly authenticated and that certain passages contain hearsay. (DE # 176 at 2-4.)

Southlake also moves to strike the expert report of Martin Horn (DE # 167-11) for same reasons (DE # 176 at 2-4), and also for the reason that he is unqualified to give expert testimony on mental health issues. (DE # 176 at 2-5.) Southlake moves to strike the Cox Report (DE # 167-24) on the grounds that it is not properly authenticated and is not relevant. (DE # 176 at 5-7). Lastly, Southlake has moved to strike plaintiff's "Exhibit V" which is a report from the United States Department of Justice ("DOJ Report") (DE # 167-22) also on grounds of improper authentication and relevance. (DE # 176 at 5-7.)

Plaintiff sought leave to supplement the summary judgment record and re-file the exhibits in response to Southlake's authentication arguments. (DE # 181.) The court granted plaintiff's motion (DE # 186) and the re-filed exhibits effectively negate Southlake authentication arguments. Moreover, whether or not it is admissible, the DOJ Report did not factor into the court's analysis of the defendants' motions for summary judgment. Therefore, as to the DOJ Report, Southlake's motion to strike is denied as moot.

In its motion to strike, Southlake highlights several paragraphs in plaintiff's "Statement of Genuine Disputes" (DE # 167 at 4-35) that Southlake contends are based upon inadmissible hearsay from the expert reports. (DE # 176 at 4.) Without offering

any explanation of the alleged hearsay issues therein, Southlake cites to statements 9, 25, 27, 43, and 154.[11] (*Id.*)

In response, plaintiff addressed each statement in turn and argued that the vast majority do not contain a hearsay issue (*e.g.*, 9, 25, 27 and 154) while the arguing that paragraph 43 is otherwise admissible under the Federal Rules of Evidence. (DE # 180 at 3-8.) In reply, Southlake declined to "parse-out what is and is not hearsay" arguing that "such a time consuming exercise is unnecessary." Rather, Southlake insists "the only conclusion" is that the reports must be excluded in their entirety.

Southlake is incorrect. "Under well-established principles of evidence, experts may rely on otherwise inadmissible out-of-court statements as a basis for forming an expert opinion if they are of a kind that experts in the field normally rely upon." *Williams v. Illinois*, 567 U.S. 50, 132 S. Ct. 2221, at 2246 (Breyer, J., concurring) (citing Fed. R. Evid. 703). Southlake has failed to show that the expert reports contain any inadmissible hearsay that necessitates striking the reports in their entirety.

Southlake also argues that the court should strike the expert report of Martin Horn because he is not qualified to opine on mental health issues. (DE # 176 at 4-5.) Southlake indicates that Horn offers testimony on a "wide variety of topics" but argues that his testimony should be stricken with regard to Southlake. Southlake only cites two

---

[11]Southlake also cited to paragraphs 78, 109, 139 and 141. However, because these paragraphs did not factor into the court's summary judgment analysis, Southlake's objection to these paragraphs is also moot.

offending passages,[12] and neither factored into the court's summary judgment analysis. Moreover, neither passage supports Southlake's argument that the court should strike Horn's expert testimony.

As noted in plaintiff's response, Horn has extensive qualifications in jail administration. (*See* DE # 180 at 8-9.) As such he is qualified to offer *non-medical* testimony pertaining to administrative policies relating to suicide prevention. Any evidence relied upon by the court falls under that category. Southlake's motion is denied as to the expert reports.

Southlake's final argument is that the Cox Report should be stricken because it is irrelevant. (DE # 176 at 6.) This argument is without merit. The findings and recommendations of the Cox Report go directly to the notice element of plaintiff's *Monell* claims. Southlake stresses Horn's testimony that the recommendations would take between 6 and 12 months to fully implement, while Odumabo arrived at the Jail just four months after Southlake received the report. Since, the "expected implementation date" was well after Odumabo's suicide, Southlake argues the Report should be struck. (DE # 176 at 6.) This argument is unpersuasive. Regardless of when the "expected implementation date" was, the report is still relevant to the issue of

---

[12](DE # 167-11 at 15 ("Southlake in turn failed to implement basic and generally accepted practices to prevent suicides at the jail" [and] "[i]n my opinion, all of the above is indicative of indifference by Southlake to their responsibilities as a provider of jail mental health care to prevent suicide."))

whether defendants took meaningful steps towards implementation. Southlake's motion to strike is denied as to the Cox Report.

III.    **CONCLUSION**

For the foregoing reasons, Southlake defendants' motion for summary judgment (DE # 143) is **DENIED**. The Jail defendants' motion for summary judgment (DE # 145) is **DENIED** as to Officer Janice Hatton and **GRANTED** in favor of Officer Linda Riley, Sergeant R. Starkey and Sergeant Hubner. Lake County Defendants' motion for summary judgment (DE # 147) is **DENIED** as to Sheriff Roy Dominguez in his official and personal capacity, and **GRANTED** in favor of Bennie Freeman in his official and personal capacity. Southlake defendants' motion to strike (DE # 175) is **DENIED.**


                                        **SO ORDERED.**

Date: March 27, 2017

                                        s/James T. Moody
                                        JUDGE JAMES T. MOODY
                                        UNITED STATES DISTRICT COURT